IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs October 10, 2023

## STATE OF TENNESSEE v. CHARLES TIMOTHY ROWDEN

**Appeal from the Circuit Court for Lawrence County**
**No. 35135     Christopher V. Sockwell, Judge**

_____

### No. M2023-00262-CCA-R3-CD

_____

A Lawrence County jury convicted the Defendant, Charles Timothy Rowden, of first degree felony murder, second degree murder, especially aggravated robbery, and aggravated arson.  The trial court merged the two murder convictions and imposed an effective sentence of life without the possibility of parole.  On appeal, the Defendant asserts that: (1) the trial court erred when it did not instruct the jury that the Defendant's girlfriend was an accomplice as a matter of law; (2) the evidence is insufficient to support his convictions; and (3) his attorney was ineffective.  After review, we affirm the trial court's judgments and remand for entry of an additional judgment form.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed and Remanded**

ROBERT W. WEDEMEYER, J., delivered the opinion of the court, in which JOHN W. CAMPBELL, SR., and KYLE A. HIXSON, JJ., joined.

John S. Colley, III, Columbia, Tennessee, for the appellant, Charles Timothy Rowden.

Jonathan Skrmetti, Attorney General and Reporter; Benjamin A. Ball, Senior Assistant Attorney General; Brent A. Cooper, District Attorney General; and Christi L. Thompson and Gary M. Howell, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION
### I. Facts

This case arises from a January 21, 2018 residential fire that killed Connis Blake, the victim.  Investigation of the fire led to the Lawrence County grand jury indicting the

Defendant for first degree premeditated murder, first degree felony murder, especially aggravated robbery, conspiracy to commit first degree murder, and aggravated arson.

## A. Trial

At the State's request, the trial court dismissed the conspiracy charge, and the case proceeded to trial, at which the parties presented the following evidence: After work on the night of January 20, 2018, Brandon Blake, the victim's son, and his girlfriend, Lindsay Taylor, went to the victim's home on Ethridge Red Hill Road in Lawrence County, Tennessee. When Mr. Blake arrived, he found the victim, almost asleep, on the couch. The victim was happy to see Mr. Blake, and they spoke for some time before Mr. Blake needed to go home. It was approximately 1:52 a.m. when Mr. Blake left the victim's home.

As he left, Mr. Blake told the victim he would lock the front door behind him. The victim responded, "No, don't worry about it[,] I've got somebody coming." Mr. Blake made two stops on his way home. Once home, at about 3:30 a.m., he received a phone call notifying him that the victim's house was on fire. Mr. Blake immediately drove back to the victim's home and found the house "up in flames." He described the scene saying, "you couldn't see the house for the fire." The victim's Ford Explorer was parked in the same place it had been earlier that night. After the firefighters extinguished the fire, the Fire Marshal notified Mr. Blake that the victim's remains were found in the house.

The victim had been alone when Mr. Blake had stopped by the residence after work. Mr. Blake noted that, at times, a woman named Sonya Beard had lived at the residence with the victim. Mr. Blake described the victim and Ms. Beard's relationship as "off and on" and "odd." At the time of the fire, Mr. Blake believed that the victim and Ms. Beard were not "together," but that Ms. Beard likely still had personal belongings in the house. Mr. Blake estimated that Ms. Beard had been out of the house for a couple of days before the fire. Mr. Blake confirmed that the victim was an alcoholic and smoked regularly. He had smelled alcohol on the victim when he saw the victim earlier that night.

Lindsay Taylor, Mr. Blake's girlfriend, testified about returning to the victim's house after notification of the fire. She recalled that law enforcement drew her attention to a watch, a knife, and a bag that were found in the yard outside the house. The bag, containing some of Ms. Beard's belongings, was lying under the victim's Ford Explorer. The watch was found lying on the ground between the house and the driveway, and the knife was located next to the front tire of the Ford Explorer. Ms. Taylor identified the watch in a photograph that the trial court entered into evidence as exhibit 8. Ms. Taylor recognized the knife as one she had seen in the victim's kitchen. Ms. Taylor confirmed that she had not seen any of these items lying outside when they left the victim's house at 1:52 a.m.

2

Latonya Durham testified that in the early morning hours of January 21, 2018, Latonya Durham was driving home from her job at Lawrence County Hospital to Savannah, Tennessee. She drove westbound on Highway 64 when she noticed "an usual glow" in the darkness. Ms. Durham turned down a side road, confirmed that the glow was a fire, and called 911. Ms. Durham pulled into the victim's driveway and noticed the fire was "more toward the front porch area," not seeing any flames "toward the end of the home." While still on the phone with 911, Ms. Durham exited her vehicle and walked to the house to see if she could hear anyone calling for help. Within a matter of minutes, flames shot through the roof and Ms. Durham backed away from the house. The fire was so intense that Ms. Durham got back into her car and moved to the side of the road.

The 911 operator instructed Ms. Durham to wait at the scene until emergency personnel arrived. Ms. Durham concluded her call with the 911 operator and then saw the porch roof collapse. She estimated that five to ten minutes elapsed between the flames breaking through the roof and the porch roof collapsing. Ms. Durham described a light pole at the end of the road and a wire that ran from the corner of the victim's home to the light pole. She saw the electrical wires begin "sparking," and she moved down the road away from it. Ms. Durham filmed a portion of the fire, and the State played the recording for the jury. Ms. Durham testified that her work day ended at a few minutes after 3:00 a.m. that morning, and she confirmed that she placed the 911 call at about 3:35 a.m.

Krystal Risner testified that she and the Defendant were in a romantic relationship and lived together in Waynesboro, Tennessee, at the time of these events. Ms. Risner also knew the victim and had been to his house to buy marijuana "a couple of times." The Defendant had gone with Ms. Risner to the victim's house on those occasions, but he had remained in the car while she went inside.

On the night of the fire, the Defendant and Ms. Risner were in their home in Waynesboro when the Defendant told Ms. Risner that he wanted to go to the victim's house and "rob the man." Ms. Risner told the Defendant she did not want to go, but he told her, "Yes, you're going." Ms. Risner drove the Defendant to the victim's house but "passed the house a couple of times" because she did not "want to turn into the house." The Defendant instructed her to turn the car around and pull into the driveway. She did so, and then the Defendant told Ms. Risner to "sit there and not move." The Defendant walked around the front of the car to the porch of the victim's house. Ms. Risner pulled the car around to the side of the house next to another "bigger" vehicle that obscured her view of the victim's house. In this new location she was unable to see "[any]thing" with respect to the Defendant's whereabouts.

Ms. Risner recalled that the victim's porch light was illuminated when they arrived, but the Defendant unscrewed the lightbulb. Because of her obscured view of the victim's house, the next time she saw the Defendant he was walking from the house toward her. The Defendant took some items from a bag lying on the floorboard of the car and went back to the house, leaving the passenger door open. With the car door open, Ms. Risner heard the Defendant "scream," "This is a robbery. You tell me where the stuff is, I won't hurt you." She heard a gunshot and then nothing else. When the Defendant returned the second time, "he was carrying stuff out." He placed boxes with jewelry, watches, and electronics on the back seat of their car. The Defendant proceeded to make several trips to the house, each time returning with "more stuff." Once the back seat of their car was completely full, the Defendant took a bottle of lighter fluid from a garbage bag on the passenger side floorboard.

From her location inside the vehicle, Ms. Risner could see the front porch of the victim's house but not inside the house. The Defendant went inside the victim's house with the lighter fluid and then returned quickly looking for a lighter. He found a "Zippo" and then went back to the victim's house. That was the Defendant's last trip inside the house and when he returned to the vehicle, they drove home. As they drove away, Ms. Risner saw, in the rearview mirror, flames through the living room window of the victim's house.

As they drove back to Waynesboro, the Defendant told Ms. Risner, "he had to have help, because [she] wouldn't help him, and he hoped it didn't bite him in the rear end." The Defendant never explained this statement, and it was all he said during the drive. The car was dark, and the Defendant was preoccupied with something in his hand that Ms. Risner was unable to see. As they drove along Highway 64, the Defendant threw something out of the car window. At home, the Defendant told Ms. Risner that he did not kill the victim but that he had "knocked him out." Ms. Risner recalled more of the conversation as follows:

> [The Defendant] said that [the victim] was laying [sic] down and [the Defendant] flipped him out of the recliner or chair or whatever it was. [The Defendant] said that he got down there on his hands and his knees and . . . looked at [the victim] and told [the victim] if he would tell [the Defendant] where the stuff was that he wouldn't - - he wouldn't hurt [the victim]."

The Defendant said that the victim did not respond to the Defendant when he made these statements. The Defendant told Ms. Risner that he fired his gun above his head. Ms. Risner did not ask the Defendant any questions because she was terrified and "didn't want to know."

4

The State showed Ms. Risner trial Exhibit 8, the photograph of a watch recovered at the scene. She confirmed that the watch looked like one that the Defendant had worn. Ms. Risner identified blue "hospital gloves" in the photograph, stating that the Defendant would put Vaseline on his dry, cracked hands and then put blue hospital gloves on his hands over the Vaseline. Ms. Risner recalled that the Defendant wore blue hospital gloves on the night they were at the victim's house.

On cross-examination, Ms. Risner agreed that she spoke with Tennessee Bureau of Investigation ("TBI") Special Agent Adam Barnes in August 2019. She did not recall telling Special Agent Barnes that the Defendant entered the victim's house three times. She maintained that the Defendant went inside the victim's house more than three times and that the Defendant's purpose in going to the victim's house was to rob the victim. Ms. Risner could not recall whether she told Special Agent Barnes that the Defendant went to the victim's house to steal pills.

On February 15, 2018, Tennessee Department of Correction Community Service Supervisor Shawn Reedy had a crew of inmates picking up trash along Highway 64 in Wayne County, Tennessee. An inmate on the work detail found a Tennessee driver's license, a debit card, and a credit card on the roadside and gave them to Supervisor Reedy. The cards were found on the shoulder of the westbound lanes going into Waynesboro. The driver's license and debit card bore the victim's name, and the credit card was a prepaid Visa that had no name on it. After the work crew finished and Supervisor Reedy had returned to the penitentiary, he was instructed to deliver the found items to the Lawrence County Sheriff's Department.

City of Columbia Assistant Fire Marshal Nathan Keeton served as the Ethridge Volunteer Fire Department Chief. On January 21, 2018, he responded to a 3:35 a.m. call about a residential fire. He arrived within ten minutes and found the house "engulfed." The fire had spread across Ethridge Red Hill Road and was "touching . . . the main power lines." Chief Keeton immediately requested "utilities [ ] be notified due to the heavy fire conditions."

Due to the flames crossing the road and the utilities falling into the roadway, Chief Keeton notified the other responders of a safer route for entry that delayed response to the victim's house. Chief Keeton confirmed that there were four tankers full of water to douse the fire at the victim's house. He testified that the Ethridge water tanker carried 1800 gallons of water and firefighters filled the tank ten times. The Ethridge tanker arrived at the scene at 4:01 a.m. and it was around 7:00 a.m. before the "fire was down." He explained that the gas main in the house was "fully engulfed" with no way to turn it off. Chief Keeton notified "utilities" who were also unable to turn it off. Ultimately they dug

a ditch in the road to "clip the line to get it cut off." It took approximately three hours to mitigate the gas issue before firefighters could extinguish the entire fire.

As firefighters worked to contain the fire, a law enforcement officer notified Chief Reedy that there was possibly someone inside the house. Approximately fifteen minutes after Chief Reedy arrived, he witnessed the southwest corner of the house collapse.

TBI Fire Investigator Mike Zimmerman testified as an expert in the field of fire investigation. Investigator Zimmerman arrived at the scene with Scooter, an accelerant detecting canine, after the fire had been extinguished. Accelerant detecting canines are trained to enter fire scenes where there is suspicion that an accelerant was used to start the fire, and to detect the possible presence of an ignitable liquid. In this case, firefighters suspected the use of an accelerant due to the "rapid-growth fire." Scooter indicated, in the area of the victim's remains in the living room, the possible presence of an ignitable liquid. Scooter also indicated in several places near the outer wall of the living room area. Investigator Zimmerman collected samples from each of the three areas that Scooter had indicated the possible presence of an accelerant and submitted the samples for further testing at the TBI.

Investigator Zimmerman explained that a canine's olfactory gland was more sensitive to scent than lab equipment. Water at the scene can also move a substance from one place to another; however, in training Scooter has been able to alert to chemicals moved by water. Due to concerns about the structural integrity of the flooring, Investigator Zimmerman did not have Scooter search the entire house. In total, law enforcement gathered seven samples of the fire debris from three locations.

TBI Latent Print Examiner Hunter Greene testified as an expert in the field of latent fingerprints. Mr. Greene received a knife collected at the crime scene and a driver's license, a paper copy of the driver's license, a Walmart card, and a Visa card collected from Highway 64. Mr. Greene processed the items and some ridges developed on the driver's license and credit cards, but the ridges were insufficient for identification purposes. Mr. Greene also processed the knife for print evidence and did not develop any latent print ridge detail.

TBI Special Agent Lisa Burgee testified as an expert in the field of forensic biology. Special Agent Burgee tested a watch, a latex glove, and a knife for DNA evidence. Analysis revealed limited DNA profiles so her findings were inconclusive. Special Agent Burgee conducted DNA testing on debris collected from the bathroom of the house and found no useable DNA samples.

TBI Special Agent Lindsey Anderson testified as an expert witness in the field of forensic science, specifically in the discipline of microanalysis. Special Agent Anderson performed fire debris analysis on seven items of evidence collected at the scene, most of which were charred wood from different areas on the premises and one metal strip from the front door threshold. The first two items, charred wood from the front door area, revealed the presence of a product that could not be positively identified or classified due to the deteriorated condition of the samples. Two other pieces of charred wood from the front door area revealed the presence of terpenes, which are present in turpentine and some scented cleaners and naturally occurs in some wood products. Special Agent Anderson stated that she would expect terpenes to be present in a burned wood sample because it is present in wood; however, she reported the finding because there is the possibility that it came from turpentine. The final three items tested included the metal door strip, and none of the items revealed the presence of any ignitable liquid residue. Special Agent Anderson clarified that this result did not eliminate the possibility that an ignitable liquid was used because there is the possibility of a sampling error. She explained that the sample could have been taken "just far enough away from where the [canine]" was indicating that the accelerant was not represented in the sample. She stated that it was also possible that there was total degradation of the accelerant in the fire.

Forensic Medical Management Deputy Chief Medical Examiner Thomas Deering testified as an expert witness in the field of forensic pathology and performed the autopsy on the victim's body. Dr. Deering described the victim's body upon initial examination as "severely burned, partially cremated." The severity of the burns indicated "a really hot fire that burned for a long time." Dr. Deering stated that the victim's body encountered heat on all sides due to "charr[ing] all the way around." What remained after the fire was approximately thirty inches long and weighed approximately thirty pounds.

Dr. Deering x-rayed portions of the remains and did not find any bullets. Next, Dr. Deering inspected the organs and found no injury to the victim's organs such as wounds that might result from a stab wound. Further, he found no indication of coronary artery disease, emphysema, or any significant natural disease that might have caused death. Dr. Deering believed he saw soot on the airways leading to the lungs but could not be certain due to damage from the "body [being] really heated for a long time" which caused "everything [to] get[] darkened." In this case, Dr. Deering did not have any blood to test to measure levels of carbon monoxide, so he extracted liver tissue to submit to the lab. Dr. Deering was unable to secure information from the confirmation test of the liver tissue to conclude whether the victim died of smoke inhalation or another cause before the fire.

Because Dr. Deering was unable to determine if the death was fire-related or occurred prior to the fire, he ultimately concluded that the cause and manner of death in this case was undetermined.

TBI Special Agent Adam Barnes was the lead investigator in this case. In the early morning hours of January 21, 2018, Special Agent Barnes learned of the fire and arrived at the crime scene at around 7:00 a.m. The Fire Department had the fire suppressed and were misting the area where a gas line had been breached and there was a "shooting flame going north . . . to the road." Firefighters had not yet recovered the body, but family members had indicated someone was in the house. Special Agent Barnes stepped up onto the porch and immediately saw the body. He observed the victim lying face down with his right arm beneath him, in front of couch springs. There was debris on top of the victim's body. Based upon the state of the victim's body, mostly bones, Special Agent Barnes believed there had been "a very hot and intense fire" in the living room area.

Special Agent Barnes surveyed the damage to the house and opined that the fire began in the front door/ living room area to the east side of the house. He explained that the entry area was completely consumed by fire whereas other areas of the house were not. The living room area of the house had no roof, walls or flooring, only charred debris. There was no flooring or floor joists around the victim's body, indicating that there was a great deal of heat in this area. The further officers inspected away from the body and living room area, the more floor material was present. Special Agent Barnes requested Officer Zimmerman and the arson canine detective to search the debris.

After the canine search, officers collected samples for further testing. The victim's body was then removed from the scene. Underneath the victim's body law enforcement found rings and a hatchet with no handle. Special Agent Barnes opined that the handle of the hatchet had likely been consumed by the fire.

After the body had been removed, law enforcement surveyed the remainder of the structure and found a heater in the kitchen area that one might insert in a fireplace. Law enforcement interviewed the victim's family members and learned that the heater did not work. The electrical break box was also considered as a cause of the fire. In determining the point of origin for the house fire, investigators look for the "lowest point of burn," the area with the most damage. In this case, Special Agent Barnes stated "it was obvious that the point of origin [was] in that living room area." Based upon the state of the victim's body, mostly bones, the duration of the fire, and the complete destruction of the flooring, Special Agent Barnes believed there had been "a very hot and intense fire" in the living room area that was "an incendiary fire."

Special Agent Barnes testified that, based upon his investigation, he believed it was clear that an accelerant was involved. He explained that fires that involve an accelerant are "high heat, high intense, and [ ] very fast fires." He stated that fires burn "up and out" and that this is the expected typical burn pattern. The use of an accelerant changes the burn

8

pattern to more localized damage. In determining that the fire was started by an accelerant he also considered witnesses' accounts of the fire before firefighters arrived.

Special Agent Barnes first spoke with Ms. Risner when he arrested the Defendant on June 13, 2018. He spoke to Ms. Risner two to three weeks later in July 2018 and then he did not speak with her again until August 2019. During this August 2019 interview, Special Agent Barnes did not tell Ms. Risner any details related to the fire. The interview was recorded, and the State played the recording for the jury. In the recording, Ms. Risner recalled the Defendant stating that he did not kill the victim but knocked him out. Special Agent Barnes confirmed that he had not told Ms. Risner about the hatchet found underneath the victim's body. Special Agent Barnes confirmed that Ms. Risner cried during the interview as she recounted the events of that night.

Special Agent Barnes identified a photograph of the knife found in the front yard in front of the victim's Ford Explorer. He also identified a photograph of the watch and the blue latex glove recovered from the victim's front yard.

The trial court included the following, with regard to accomplice testimony, in the jury instructions:

> T.P.I. CRIM. 42.09
> ACCOMPLICE
>
> An accomplice is a person who knowingly, voluntarily, and with common intent with the principal offender unites with him or her in the commission of the crime. If a witness was an accomplice in the crime, then his or her testimony must be corroborated. Corroborating evidence is that evidence, entirely independent of the accomplices testimony, which, taken by itself, leads to the inference not only that a crime has been committed but also that the defendant was implicated in it. This independent corroborative testimony must include some fact or circumstance that affects the defendant's identity. Corroborative evidence may be direct or entirely circumstantial and it need not be adequate, in and of itself, to support a conviction. It is sufficient if the corroborative evidence fairly and legitimately tends to connect the defendant with the crime charged. It is a question for the jury to determine whether an accomplices testimony has been sufficiently corroborated. Accomplice testimony cannot be corroborated by another accomplice's testimony.
>
> In this case it is a question for the jury to determine whether the witness, Kr[y]stal Risner, was an accomplice in this alleged crime. If you

9

find from the proof that the witness was an accomplice, then the defendant cannot be convicted upon the uncorroborated testimony of this witness. If you find that the witness was not an accomplice, then you will judge the weight to be given to her testimony just as you do that of the other witnesses in the case.

After deliberation, the jury convicted the Defendant of the lesser-included offense of second degree murder, and the charged offenses of first degree felony murder, especially aggravated robbery, and aggravated arson. The trial court merged the two murder convictions and imposed an effective sentence of life without the possibility of parole.

## B. Motion for New Trial Hearing

The Defendant filed a motion for new trial. As relevant to this appeal, the Defendant alleged that the trial court erred in denying the Defendant's oral motion for judgment of acquittal and that he was entitled to a new trial because the verdict was against the weight of the evidence. The Defendant filed an amended motion asserting ineffective assistance of counsel because the Defendant's trial attorney ("trial counsel") had failed to call witnesses identified by the Defendant. He also claimed that trial counsel had been ineffective by not moving for acquittal or requesting jury instructions regarding the uncorroborated testimony of Ms. Risner, who he claimed was an accomplice as a matter of law.

The Defendant called trial counsel as the only witness at the motion for new trial hearing. Trial counsel testified that there was an in-chambers discussion about Ms. Risner's involvement in the case. He recalled the issue of Ms. Risner being an unindicted accomplice and that, "we were all, basically, of the mindset that based on the evidence that had come out so far in the trial that [she] would be an accomplice of fact." He confirmed that the trial court instructed the jury on Tennessee Pattern Instruction 42.09, referencing accomplice testimony. Trial counsel reiterated that there was general agreement that Ms. Risner was an accomplice in fact.

Trial counsel testified that initially, three people were indicted as co-defendants in this case. The State's theory had been that the Defendant, Jimmy Dale Hogan, and Paul McNeal had "roughed [the victim] up, robbed him, and then burned down his house. After Ms. Risner's 2019 interview, the State dismissed the indictments against Jimmy Dale Hogan and Paul McNeal. Trial counsel stated that he wanted to introduce the dismissed indictments and that he subpoenaed Ms. Beard and another man but was unable to serve either witness. Trial counsel was hesitant regarding introduction of the dismissed

indictments because he believed Ms. Risner's testimony would rebut a defense theory based upon the dismissed indictments.

Following the hearing, the trial court issued a written order denying the motion for new trial:

> This cause came to be heard on the Motion for New Trial filed by the Defendant whereby the Defendant originally argued that the Court did not instruct the jury on accomplice testimony when, in fact, upon review of the record as a whole, [the] Defendant acknowledged that the Court did instruct the jury on accomplice testimony and that the Court had addressed said issue. [The] Defendant renewed its motion for new trial in arguing that the Court committed a reversible error when it declined to find [Ms.] Risner to be an accomplice as a matter of law as to Counts 2 and 3 (First Degree Murder/Felony Murder and Especially Aggravated Robbery). [The] Defendant alleges that the Court's reasoning that there was some issue as to whether Ms. Risner knew the Defendant planned to commit a murder would not apply to Counts 2 and 3, since Ms. Risner herself testified at trial that the Defendant knew they were going to Lawrence County to rob a man that night. The Court finds there was ample evidence that her participation was not voluntary, nor did the parties' share common intent, as per her testimony. The Court relied upon the case of *Bland v. State*, WL 3793697, *see State v. Green,* 915 S.W.2d 827, 831 (Tenn. Crim. App. 1995); *State v. Lawson*, 794 S.W.2d 363, 369 (Tenn. Crim. App[]. 1990). When evidence is unclear, it becomes a question of fact for the jury to determine whether the witness is an accomplice and, if so, whether there is corroborating evidence to support the witness's testimony. *See Green*, 915 S.W2d at 831-32. Thus, it became a jury question as to whether she was an accomplice, especially considering her testimony concerning duress and coercion during the time span of her involvement. In *Bland*, the Court found that:

>> The evidence at trial was not clear and undisputed that Christopher Williams participated in the crime. Williams testified that he was not armed, that he remained in the alley, and that he did not know the defendant was going to kill the victim, as the plan had been for the defendant to just shoot the victim in the legs and rob him. We conclude, therefore, that the trial court properly found that whether Williams was an accomplice was a question of fact to be determined by the jury. The defendant is not entitled to relief on the basis of this issue.

11

The defendant in *Bland* had alleged that the trial court erred by denying his request to instruct the jury that Christopher Williams was an accomplice as a matter of law due to his participation. Participation in knowing that a crime was being committed does not in and of itself make the individual an accomplice as a matter of law. As stated previously, it may be a jury question. For this reason, [the] Defendant's Motion for a New Trial is hereby denied.

## II. Analysis

On appeal, the Defendant asserts that: (1) the trial court erred when it did not instruct the jury that Ms. Risner was an accomplice as a matter of law; (2) the evidence is insufficient to support his convictions; and (3) his attorney was ineffective.

## A. Accomplice Instruction

The Defendant argues that the trial court erred when it failed to instruct the jury that Ms. Risner was an accomplice as a matter of law. The State responds that the Defendant has waived this claim because he failed to request the instruction. The record about this issue is unclear because the discussion regarding this issue occurred in chambers and is not part of the record before us. Counsel testified at the motion for new trial hearing that the issue was not overlooked. It was discussed in-chambers, and the trial court determined that Ms. Risner was not an accomplice as a matter of law. The trial court instructed the jury consistent with the Tennessee Pattern Jury Instruction on accomplices. As such, we will consider whether the trial court erred in this determination.

"It is well-settled in Tennessee that a defendant has a right to a correct and complete charge of the law so that each issue of fact raised by the evidence will be submitted to the jury on proper instructions." *State v. Farner*, 66 S.W.3d 188, 204 (Tenn. 2001) (citing *State v. Garrison*, 40 S.W.3d 426, 432 (Tenn. 2000); *State v. Teel*, 793 S.W.2d 236, 249 (Tenn. 1990)). Accordingly, trial courts have the duty to give "a complete charge of the law applicable to the facts of the case." *State v. Davenport*, 973 S.W.2d 283, 287 (Tenn. Crim. App. 1998) (citing *State v. Harbison*, 704 S.W.2d 314, 319 (Tenn. 1986)). An instruction will be considered prejudicially erroneous only if it fails to submit the legal issues fairly or misleads the jury as to the applicable law. *State v. Faulkner*, 154 S.W.3d 48, 58 (Tenn.2005) (citing *State v. Vann*, 976 S.W.2d 93, 101 (Tenn. 1998)).

An accomplice is defined as one who "knowingly, voluntarily, and with common intent participates with the principal offender in the commission of the crime alleged in the charging instrument." *State v. Griffis*, 964 S.W.2d 577, 588 (Tenn. Crim. App. 1997). The

12

test for determining whether a witness is an accomplice is whether the witness could be indicted for the same offense as the defendant. *See State v. Green*, 915 S.W.2d 827, 831 (Tenn. Crim. App. 1995); *State v. Lawson*, 794 S.W.2d 363, 369 (Tenn. Crim. App. 1990). When the evidence is clear and undisputed that a witness participated in the crime, then the trial court must declare the witness to be an accomplice as a matter of law and instruct the jury that the witness's testimony must be corroborated. *Lawson*, 794 S.W.2d at 369. On the other hand, when the evidence is unclear, it becomes a question of fact for the jury to determine whether the witness is an accomplice and, if so, whether there is corroborating evidence to support the witness's testimony. *Id*.; *see Green*, 915 S.W.2d at 831-32.

The evidence at trial was not clear and undisputed that Ms. Risner participated in the crime. Ms. Risner testified that the Defendant told her she was driving him to the victim's house where he planned to rob the victim. She told him no, but he insisted. The Defendant ordered Ms. Risner to stay in the car where she remained for the duration of the offenses, and from her vantage point she was unable to see the Defendant's movements and actions inside the house. She did not know that the Defendant was going to set the house on fire and kill the victim, as the Defendant had only stated an intent to rob the victim. *See State v. Bland*, No. W2014-00991-CCA-R3-CD, 2015 WL 3793697 at *4 (Tenn. Crim. App. June 16, 2015), *perm. app. denied* (Tenn. October 15, 2015). Ms. Risner testified to being terrified and an unwilling participant, saying that she even intentionally drove past the house until the Defendant made her drive into the driveway. We conclude, therefore, that the trial court properly found that Ms. Risner was not an accomplice as a matter of law and that whether Ms. Risner was an accomplice was a question of fact to be determined by the jury. The jury was so instructed. The Defendant is not entitled to relief on this issue.

## B. Sufficiency of the Evidence

The Defendant asserts that the evidence is insufficient to support his convictions for felony murder and especially aggravated robbery because the State failed to corroborate the testimony of Ms. Risner, who he asserts was an accomplice and, as such, her testimony required corroboration. The Defendant does not contend that the evidence failed to establish the elements of the offenses, he argues only that no evidence corroborates Ms. Risner's testimony. The State responds that the evidence did not establish that Ms. Risner was an accomplice and that, even if she were an accomplice, there was sufficient corroboration to support the Defendant's convictions.

When an accused challenges the sufficiency of the evidence, this Court's standard of review is whether, after considering the evidence in the light most favorable to the State, "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see* Tenn. R. App. P.

13(e); *State v. Goodwin*, 143 S.W.3d 771, 775 (Tenn. 2004) (citing *State v. Reid*, 91 S.W.3d 247, 276 (Tenn. 2002)). This standard applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. *State v. Pendergrass*, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999) (citing *State v. Dykes*, 803 S.W.2d 250, 253 (Tenn. Crim. App. 1990)). In the absence of direct evidence, a criminal offense may be established exclusively by circumstantial evidence. *Duchac v. State*, 505 S.W.2d 237, 241 (Tenn. 1973). "The jury decides the weight to be given to circumstantial evidence, and '[t]he inferences to be drawn from such evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence, are questions primarily for the jury.'" *State v. Rice*, 184 S.W.3d 646, 662 (Tenn. 2006) (quoting *Marable v. State*, 313 S.W.2d 451, 457 (Tenn. 1958)). "The standard of review [for sufficiency of the evidence] 'is the same whether the conviction is based upon direct or circumstantial evidence.'" *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)).

In determining the sufficiency of the evidence, this Court should not re-weigh or reevaluate the evidence. *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Nor may this Court substitute its inferences for those drawn by the trier of fact from the evidence. *State v. Buggs*, 995 S.W.2d 102, 105 (Tenn. 1999) (citing *Liakas v. State*, 286 S.W.2d 856, 859 (Tenn. 1956)). "Questions concerning the credibility of witnesses, the weight and value to be given the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact." *State v. Bland,* 958 S.W.2d 651, 659 (Tenn. 1997). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." *State v. Grace*, 493 S.W.2d 474, 476 (Tenn. 1973). The Tennessee Supreme Court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

*Bolin v. State*, 405 S.W.2d 768, 771 (Tenn. 1966) (citing *Carroll v. State*, 370 S.W.2d 523, 527 (Tenn. 1963)). This Court must afford the State of Tennessee the "'strongest legitimate view of the evidence'" contained in the record, as well as "'all reasonable and legitimate inferences'" that may be drawn from the evidence. *Goodwin*, 143 S.W.3d at 775 (quoting *State v. Smith*, 24 S.W.3d 274, 279 (Tenn. 2000)). Because a verdict of guilt against a defendant removes the presumption of innocence and raises a presumption of guilt, the

14

convicted criminal defendant bears the burden of showing that the evidence was legally insufficient to sustain a guilty verdict. *State v. Carruthers*, 35 S.W.3d 516, 557-58 (Tenn. 2000) (citations omitted).

The rule is well settled in Tennessee that a defendant cannot be convicted on the uncorroborated testimony of an accomplice. *Sherrill v. State*, 321 S.W.2d 811, 814 (1959). An accomplice is defined as "a person who knowingly, voluntarily, and with common intent with the principal offender, unites in the commission of a crime." *Clapp v. State*, 30 S.W. 214, 216 (1895). To corroborate the testimony of an accomplice, "there should be some fact testified to, entirely independent of the accomplice's evidence, which, taken by itself, leads to the inference, not only that a crime has been committed, but also that the defendant is implicated in it." *Clapp*, 30 S.W. at 216. This corroboration must consist of some fact or circumstance which affects the identity of the defendant. The necessary corroboration, however, need be only rather slight circumstances. *See, e.g., Bethany v. State*, 565 S.W.2d 900, 904 (Tenn. Crim. App. 1978) (citing *Garton v. State*, 332 S.W.2d 169 (Tenn. 1960); *Alexander v. State*, 229 S.W.2d 331 (Tenn. 1950)). Furthermore, the jury is to determine the degree of evidence necessary to corroborate the testimony of an accomplice, and it is sufficient "if there is some other evidence fairly tending to connect the defendant with the commission of the crime." *Clapp*, 30 S.W. at 217.

In this case, Ms. Risner testified that the Defendant told her she would drive him to the victim's house with his stated intent to rob the victim. Ms. Risner was unaware that the Defendant would kill the victim and commit arson. The victim did not participate in any of the criminal acts that the Defendant committed at the victim's house and remained in the car where the Defendant ordered her to stay. Ms. Risner testified that she was terrified and did not inquire any further into the Defendant's acts. The evidence supports a jury's conclusion that Ms. Risner did not voluntarily, with a common intent, participate in the commission of the Defendant's crimes. Even so, if the jury found Ms. Risner was an accomplice, there was sufficient corroboration of her testimony.

Ms. Risner testified that the Defendant told her he intended to rob the victim. She stated the Defendant made numerous trips through the victim's yard with items from the victim's house. Ms. Risner testified that the Defendant owned blue "hospital gloves" that he commonly wore to moisturize his chapped hands. She recalled that the Defendant wore blue "hospital gloves" the night of these crimes. Firefighters found items from the victim's house in the front yard of the residence including the remnant of a blue "hospital glove." Ms. Risner testified that the Defendant took an accelerant into the residence. Arson investigation of the scene indicated the use of an accelerant to cause a fire of the intensity of the fire at the victim's house. Additionally, an accelerant detecting canine indicated the presence of accelerant in the living room area of the house, the area of the house where the victim was found and the area that received the most significant damage. Finally, Ms.

15

Risner testified that, as they drove home, the Defendant was manipulating something in his hands that she was unable to see. As they drove down Highway 64, the Defendant threw some items out of the car window. Later, a corrections crew picking up trash along Highway 64 found some of the victim's items on the side of the road.

Based on our review of the record, we conclude that there is sufficient corroborating evidence which tends to connect the Defendant with the commission of the charged offenses. The Defendant is not entitled to relief as to this issue.

### C. Ineffective Assistance at Trial

The Defendant next asserts that he received ineffective assistance of counsel. This Court has consistently "warned defendants and their counsel of the dangers of raising the issue of ineffective assistance of trial counsel on direct appeal because of the significant amount of development and fact finding such an issue entails." *Kendricks v. State*, 13 S.W.3d 401, 405 (Tenn. Crim. App. 1999). Raising the issue of ineffective assistance of counsel on direct appeal is "a practice fraught with peril." *State v. Thompson*, 958 S.W.2d 156, 161 (Tenn. Crim. App. 1997).

Nonetheless, our supreme court has stated that claims of ineffective assistance of counsel may be presented on direct appeal and that the reviewing court must apply the same standard as utilized for such claims in post-conviction proceedings. *See State v. Burns*, 6 S.W.3d 453, 461 n. 5 (Tenn. 1999). Under the Sixth Amendment, when a claim of ineffective assistance of counsel is made, the burden is on the petitioner to show (1) that counsel's performance was deficient and (2) that the deficiency was prejudicial. *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *see Lockhart v. Fretwell*, 506 U.S. 364, 368-72 (1993). In other words, a showing that counsel's performance falls below a reasonable standard is not enough; rather, the petitioner must also show that but for the substandard performance, "the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. The *Strickland* standard has been applied to the right to counsel under article I, section 9 of the Tennessee Constitution. *State v. Melson*, 772 S.W.2d 417, 419, n. 2 (Tenn. 1989).

A defendant will only prevail on a claim of ineffective assistance of counsel after satisfying both prongs of the *Strickland* test. *See Henley v. State*, 960 S.W.2d 572, 580 (Tenn. 1997). The performance prong requires a defendant raising a claim of ineffectiveness to show that counsel's representation fell below an objective standard of reasonableness or "outside the wide range of professionally competent assistance." *Strickland*, 466 U.S. at 690. The prejudice prong requires a defendant to demonstrate that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id*. at 694. "A reasonable probability is a

probability sufficient to undermine confidence in the outcome." *Id*. Failure to satisfy either prong results in the denial of relief. *Id*. at 697.

In *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975), our Supreme Court decided that attorneys should be held to the general standard of whether the services rendered were within the range of competence demanded of attorneys in criminal cases. Also, in reviewing counsel's conduct, a "fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Strickland*, 466 U.S. at 689. Thus, the fact that a particular strategy or tactic failed or even hurt the defense does not, alone, support a claim of ineffective assistance. Deference is made to trial strategy or tactical choices if they are informed ones based upon adequate preparation. *See United States v. DeCoster*, 487 F.2d 1197, 1201 (D.C. Cir. 1973).

In the motion for new trial, the Defendant raised two issues with respect to trial counsel's representation: (1) trial counsel failed to call witnesses; and (2) trial counsel failed to request jury instructions for an accomplice as a matter of law. In his brief, the Defendant argues several claims not raised in the motion for new trial or addressed at the hearing. The State contends that the appellant has waived these issues because they were not included in the motion for a new trial. Tenn. R. App. P. 3(e). We agree with the State and address only the issues raised in the motion for new trial and presented at the hearing.

The Defendant argues that trial counsel was ineffective because he failed to call witnesses to testify on the Defendant's behalf at trial. The State responds that the Defendant has failed to show trial counsel was ineffective for failing to call witnesses. We agree with the State.

As an initial note, the Defendant complains that trial counsel called no witnesses at trial; however, Defendant did not present any testimony from potential witnesses at the motion for new trial hearing. The Defendant only presented testimony from trial counsel. Because the witnesses Defendant complains of did not testify at the hearing, the Petitioner cannot show prejudice. *See Black v. State*, 794 S.W.2d 752, 757 (Tenn. Crim. App. 1990). Neither the trial court nor this court can "speculate or guess" about whether such testimony would have affected the outcome of the Defendant's trial. *See id*. Therefore, the Defendant failed to establish by clear and convincing evidence that trial counsel's decision regarding witnesses was deficient or caused the Defendant prejudice.

The Defendant also argues that trial counsel was ineffective for failing to request a jury instruction on corroboration of testimony from an accomplice as a matter of law. At the motion for new trial hearing, trial counsel testified that the role of Ms. Risner was

17

discussed in-chambers and, ultimately, the trial court determined that it was a question of fact. Trial counsel stated that he agreed with the trial court's determination and thus, he did not request a jury instruction that Ms. Risner was an accomplice as a matter of law. The trial court determined that it was a question of fact and so instructed the jury.

The Defendant has failed to present evidence that trial counsel was deficient in this respect. The trial court considered this issue and ultimately determined that Ms. Risner was not an accomplice as a matter of law. Therefore, the Defendant has failed to show that trial counsel would have prevailed had he challenged the trial court's ruling.

### D. Judgment Forms

A Lawrence County grand jury indicted the Defendant for first degree premeditated murder (Count 1); first degree felony murder (Count 2), especially aggravated robbery (Count 3); conspiracy to commit first degree murder (Count 4); and aggravated arson (Count 5). Before trial, the State dismissed the Count 4. At the conclusion of the jury trial, Defendant was convicted of all the remaining charges but, for Count 1, the jury convicted the Defendant of the lesser-included offense of second degree murder. The trial court merged Count 1 into Count 2. In doing so, the trial court entered one judgment form for Count 2. In the "Special Conditions" box on the judgment form, the trial court included "Count 1, conviction for second degree murder merges with Count 2, conviction for felony first degree murder.

In *State v. Berry*, 503 S.W.3d 360 (Tenn. 2015), the supreme court explained that the proper procedure for entry of judgments in the event of merger of convictions is for the trial court to enter a separate judgment in each count. The court explained:

> [W]hen two jury verdicts are merged into a single conviction, the trial court should complete a uniform judgment document for each count. The judgment document for the greater (or surviving) conviction should reflect the jury verdict on the greater count and the sentence imposed by the trial court. The judgment document for the lesser (or merged) conviction should reflect the jury verdict on the lesser count and the sentence imposed by the trial court. Additionally, the judgment document should indicate in the "Special Conditions" box that the conviction merges with the greater conviction. To avoid confusion, the merger also should be noted in the "Special Conditions" box on the uniform judgment document for the greater or surviving conviction.

*Id*. at 364. Therefore, on remand, the trial court should enter a judgment document for Count 1, following the instructions of the supreme court.

18

## III. Conclusion

Accordingly, the judgments of the trial court are affirmed.  We remand the case to the trial court for the entry of corrected judgments reflecting proper merger.

_____

ROBERT W. WEDEMEYER, JUDGE

19